today is PNC Bank v. Boyter. Mr. Johnsonman, whenever you are ready, you may proceed. Thank you, Your Honor. May it please the court, my name is Joseph Jentleman. I represent Sam and Carol Boyter, who are both here in the gallery. I also have a young law student with me, Lauren Healy, that's helped me with this case. First blush, this might just look like a ho-hum, boring, insignificant foreclosure case, right? But if you look a little deeper here... What's your best authority for the proposition that a release of a mortgage is also a release of the underlying note? I'm not making that argument, Your Honor. I'm making an argument. There's no such proposition that says if you... You have to be more specific. In fact, here, a mortgage lien is something different than a mortgage deed. And I think that's part of the problem the district court had here, is we have a mortgage deed that has more... So let me try to reframe the question so that you can answer it. Yes. What's the difference? The difference is you have to read what was actually in the language used in this specific case. I think these are case-specific situations here. We have four... I have four releases that were recorded. Now, in Illinois, recording documents is a pretty significant thing. Almost up there, the equivalent is a judicial admission. So you better be careful about what you put in a recorded document. And if we look at the language that was used here, Your Honors, and I've got a demonstrative exhibit, if I could give to you, that shows the language. That won't be necessary because we do have your huge record. But my question really follows up from Judge Pryor's question. Illinois courts allow contradictions of the consideration recitals in these things. And just because the consideration recital for the mortgage release referred to satisfaction of the note in whatever language it was using, doesn't mean that you can't go back and look at that. And there were many, many things in this record that suggested that some of these notes were not released, were not satisfied. There was never a 1099 on the $2,000 note. The $203,000 note doesn't seem to have been satisfied. So you're placing more weight than I think it can sustain on the consideration recitals. It's just not the consideration recitals. There's also a release in this document. But what is released? The district court thought what was released was the mortgage. So now it's an unsecured note. The district court's obviously wrong, I believe, because the district deed had in the first page a mortgage lien. Then it has 12 other pages of additional obligations. So when it released, the release says all right title, interest, claim, or demand whatsoever it may have acquired in the mortgage or through the mortgage. So therefore the release is saying it's releasing every term of the mortgage, not just the mortgage lien, but all the terms of the mortgage, plus it's releasing all the claims that can be made through the mortgage. With regard to the $200,000 note, I understand that there was an August 2008 release, right? Correct. Of that specifically. The lender says that was by mistake. Your position is no, that release kind of releases your client from any obligation with regard to the $200,000 note. But then a year later, Mr. and Mrs. Oytner agreed to a new mortgage to secure the same debt. So that later conduct seems inconsistent with the position that somehow they believe that the 2008 release freed them from the obligations imposed upon them by the $200,000 note. So why did they enter into that later mortgage? First of all, they didn't enter into that mortgage. There was no secondary mortgage. The mortgage you're talking about was in 2009 that was created. My clients say they never signed that document because there was no reason for it and they never appeared in front of Ms. Brennan to sign that document and she said she notarized it. So that document was never, that's not being sued upon in this court. My clients contest the validity of that document. Now the only thing that was done after the 2003 note that the other argument was made, well, they signed a note modification agreement in 2009 that extended the maturity date on a note that had been paid. But on July, I don't know if that's accurate, on July 8th of 2009, the boarders granted National City a new mortgage against their residential property of $200,000. That's a docket 210, page 138, as well as page 150. So now are we contesting that that did not occur? My clients contest it. They did not sign that document because they never appeared in front of Ms. Brennan and Ms. Brennan says that that document was signed in front of her. So yes, we contest the validity of that later mortgage and they're not suing, the bank is not suing on that mortgage. And when asked about it in this case, they said they didn't sue on it because of the circumstances surrounding it. Where did that come from in 2009? Why would you be, what would be the reason to enter a mortgage in 2009? What, to clean up the fact because you released the mortgage earlier based on the fact that you had been paid all this money? I think the question that was kind of left out there is once the mortgage was released, there's still a promissory note for $200,000. And so the record would suggest that your clients entered into the mortgage in 2009 because there was an understanding there was still an outstanding debt based on the $200,000 note that had not been satisfied. Correct. Well, there was an original relationship that went back to 1999 that then was all restated pursuant to a settlement agreement in March of 2008. And that's where we got the $200,000 note, the $600,000 note, the $200,000 mortgage and the $600,000 mortgage and two assignments and rent. And a couple of days later, they add in the $203,000 note and mortgage. So those are all the documents. Now, they're all cross-collateralized, right? So you can sue on the, you can take the $200,000 note and sue on the $600,000 mortgage. So let's answer the question, where was the $200,000 note satisfied? My clients say on January 31st, 2008, there was a closing. What material evidence is there in the record of that? I mean, not testimony. Are there documents that show the satisfaction of the $200,000 note? Other than the release. Okay. My clients can't. Other than your release. You've got the documents showing my clients got enough money to pay the bank off, right? We've got American Charter. He's got $1.7 million. And that took care of the $600,000. Nobody's worried about the $600,000 note. Right. My client's saying that took care of everything more than that because before then, we got payoff letters. There was evidence on the $600,000 note and there wasn't any paper trail showing how the $200,000 note was paid. The same transaction is what we're saying. You say that, but where's the evidence? Then I've got these things that say that's exactly what happened because it says that all the I guess, Mr. General, the question is you have the release that you point to and you have this loan, this other big loan that you got. And the question is, is there any other document or indication in the record that would corroborate your client's contention that the $200,000 was paid? Common sense. And I got a note. Hold on, Mr. General. I got a note. I'm asking you whether there's any document that you can point to in the record that indicates that that $200,000 was paid other than the release. Yes. I would say that we've got notes from American Charter banks saying my client was $1.7 million at that point in time. So he had the money. He went to a closing. So we owed at that point either $800,000 or a million to PNC. So what PNC is trying to make us believe is that, what, we only paid PNC $600,000, not $800,000 or not a million? And then they gave us these releases that said, you paid us for everything? Why would they do that? Why would the bank accept less money than what was owed? Because everything was cross-collateralized. There was no reason for the bank to allow these release deeds to be recorded but for they were paid in full because another important reason was American Charter Bank was going to come in first place. This goes back to my original question that you weren't able to answer. You're equating a promissory note and a release of the collateral as the same thing. And I'm still asking the same question. Why is the – allow me to finish the question before you attempt to answer the question. Can you tell me the distinction in why the release of the collateral was also a release of the promissory note? Based on the terms of the agreement that were negotiated that were one, in part, of the release of mortgages that says everything's released, that everything in the mortgage and everything that can be brought through the mortgage. And secondly, there's a term on all the mortgage deeds that says that required the performance of any and all obligations under the note-related documents in this mortgage. That was one of the terms in the mortgages. We all agree that all the terms of the mortgages were released. So whatever was in the mortgage documents has been released. Therefore, I have four pieces of paper that say that P&C releases the obligations of performance of any and all obligations owed under the notes because that term is actually in the mortgages here. Now, that's usually – that's very rare. Usually, you don't put that in the mortgage, this additional term. So you have to read – if you read the clear and explicit terms of the four releases and the documents in this term that was in the mortgage itself that's been released, the bank has released all of their claims here. Thank you, Mr. Chairman. Ms. Gattone? Gattone. Gattone. Ms. Gattone. Good morning, Your Honors. Good morning. May it please the Court. I'd like to just start off with a couple clarifications from counsel's arguments. First of all, P&C never testified that the release of the $200,000 mortgage was in error. The testimony was actually that it was likely because it was not unusual for the bank to release multiple notes – multiple mortgages in an effort to get paid on an underlying large debt. So, for instance, in this case, there was a $600,000 mortgage and note and a $200,000 junior mortgage and note on this commercial property called Ripburger. And Hayden, his testimony, which the Court found credible, was that it was highly likely and not unusual that, in fact, in order for the bank to get paid on the $600,000 note, they also agreed to release the mortgage on the $200,000 note so, in fact, the Boyders could enter into this new banking relationship with American Chartered. The same exact thing happened in the Polo case. The defendants were selling their property and the bank accepted a lesser amount than was actually owed. And when the bank entered a release, recorded a release, which said very similar language as in this case before the Court, that, in fact, the note was paid and canceled, the bank then subsequently sued for additional monies. And the Polo Court found that they could examine the extrinsic evidence around the release document, around the consideration provision that's in the release, to make the determination that, in fact, the bank had not been paid in full and was entitled and did not release any other obligations of the borrowers other than the mortgage itself. Can we take a look at the language that we have been talking a little bit about, and that's in consideration of the payment, the release language. In consideration of the payment of the indebtedness secured by the mortgage deed and the cancellation of the note thereby secured, National City Bank released the Borders from the mortgage. Yes. And so, I think there's a suggestion that cancellation of the note language is consideration that we're also releasing the note. And why is that argument or, I guess, what is PNC's best contention that that was not consideration? Well, there's several arguments, Your Honor, to be made. The first and foremost is the notion, as the Court pointed out earlier, is that the note itself is the document under which the money is loaned. The mortgage is nothing more than the security that is given to the lender in order to make sure that that note is ultimately paid. Now, the note can stand independent of the mortgage, but the mortgage cannot stand independent of the note.  So, in this particular case, yes, the language is very generic language. In fact, it includes the $1 provision. No one has suggested that the Borders got to obtain the release by paying $1. That is, again, very generic release language. If you look in the release documents, you'll note it's very specifically spelled out what document is released. It has the recording number of the mortgage. It has the date of the mortgage. It has the date that the mortgage was actually recorded. Very specific information. But the information in the consideration provision is very generic and very vague. It's a lowercase indebtedness. It's a lowercase note. The date of the note is not identified. The amount of the note is not identified. When documents are released or, well, actually, Hayden testified that a note technically is not released. A note is canceled or paid in full. And then when a note is canceled, the note is typically stamped, canceled, paid in full, and sent to the borrower. That wasn't done in this case. PNC was always in possession at the time of trial and to date of that original $200,000 note, which, similarly in Polo, was never marked canceled and was never taken off the books of PNC. So, in that regard, the language, when you consider the extrinsic evidence, as Judge Dunn in the Polo Court, the language that is in the consideration provision of that release is not controlling of the actual facts of the circumstances surrounding the case. Counsel posed the question, why would the bank accept less than what was owed? And, again, I briefly touched on it, but it's an important point. Oftentimes, banks will accept a lesser amount than is owed, but not necessarily give up all of their security or all of the loan documents in order to get paid a larger sum. That is exactly the scenario that happened in the Polo case. The language that was in the Polo case is very much on point with the language that was in that release and the language in this release. And the court ruled that the consideration provision was not, in fact, controlling. There's no evidence in this case that the $200,000 note or the $203,000 note were, in fact, ever paid in full. In fact, if you look at the note modification, as Your Honor pointed out, the fact that there was a modification of the $200,000 note almost a year, shortly less than a year after the purported payoff, makes no sense. This is, you're talking about the April 3, 2009? Yes. The April 3, 2009 modification agreement that not only extended the maturity date of that $200,000 note that they're now claiming was previously paid, but it also ratified and confirmed all of the terms and the conditions of that note, including the indebtedness. So, the fact that there was this note modification, and then, again, another couple months later. The 1099 reporting form? Yes. Was that provided to anyone outside of the bank? No. If a 1099 reporting form is issued by the bank, it must be sent to the borrower. And Hayden testified, and the email chain established that he did his due diligence and looked into whether or not the bank ever issued a 1099. And the bank did not issue a 1099, and there's nothing in that record to it that's contrary to that. So, the 2009? Can you talk to me a bit about the point at which the person working for the bank thought that the $200,000 note and $203,000 note were duplicative? Yes. I mean, it seems like there's so many mergers of the various banks in this case, and so many kind of documents that are going out back and forth, that it seems not unreasonable for the voiders to be kind of reeling or somewhat confused about kind of what was pending, what isn't. They're getting kind of communications from the bank both ways. So, can you talk to me about that particular instance? Certainly, Your Honor. It's very clear when you look at the settlement agreement and the amendment to the settlement agreement that were entered into by the parties and PNC from 2006. The settlement agreement very specifically called for a refinancing and restructuring of $1.2 million worth of debt. That debt was restructured into a $600,000 commercial first mortgage and note that was going to refinance the existing first mortgage on the Rittberger property, the $200,000 note and mortgage that was going to act as a junior loan and lien on the Rittberger property, and a $405,000 primary mortgage on the voiders' residence, which was going to act as a refinance. But that changed with the amendment, correct? Absolutely, Your Honor. That changed with the amendment. When the amendment was entered into, the amendment said, no, no, we're not going to refinance that primary mortgage. We're going to let the primary mortgage on the residence stand, and in lieu of refinancing that, we're going to enter into a $203,000 junior mortgage on the residence. So, the $200,000 note was on the commercial property. The $203,000 mortgage and note was on the residence, both junior. Now, obviously, Brennan, who was the bank officer, testified that she was not a party to all of those negotiations that happened a year prior. Now, whether Brennan had access to the agreement and the amendment is unknown. It's unclear. It was never discussed. But what Brennan did say was, clearly, upon her review of that, she didn't realize that those two documents created the need for those two notes. She didn't understand that the collateral was different for both notes. So, the fact that she made a judgment call error and sent that to the dead file, which, again, there's ample testimony that dead doesn't mean it's uncollectible, that dead doesn't mean that the borrowers don't actually owe that money, but it was an internal designation. So, the borrowers aren't notified? No. The borrowers were never notified, and they didn't find out about that designation until discovery, when we tendered that document with all of our other discovery, as was required. All right. Thank you. Thank you, Your Honors. Thank you, Ms. Katone. Mr. Gentleman, I'll give you two minutes on rebuttal. Okay. Thank you, Your Honor. Thank you, Your Honors. May it please the Court. The release. The release is based on the language in the four releases that were recorded. So, there's a release in there. Now, the release language says it releases all claims in the mortgage, which we've talked about, but then the next word is through the mortgage. So, what does that mean? That's saying that the bank has agreed to release all claims of the notes because the notes are the ones that can be pursued through the mortgage. Look at the complaint in this case. Count one is a claim on the $203,000 note with the $203,000 mortgage. So, there's a claim on the note made through the mortgage. Count two is just a claim on the $200,000 note. It's not through. So, the clear, unequivocal language of the release says it's not only releasing the claims in the mortgage, but any claims that could be made through the mortgage. What's your best evidence that these notes were paid? I've got four recorded documents, one. Two, I've got a note from American Chartered saying my guy got enough money to pay all these notes off, and he paid at least $600,000 that they're not quibbling about. So, that plus the $200,000 debt, what's your best evidence that that was paid? You have the release and what else? The release, and I have the notes showing my guy got enough money from another bank to pay off this bank. No, I'm not asking what American Chartered did. I'm saying what evidence do you have that that money was used to pay a $200,000 debt? Well, the bank waited too long. We subpoenaed it. We couldn't get any other documents because the title company, this was closed at a title company, not my guy's checking account. Chicago Title did the closing. It was over 10 years later because they didn't file a suit for 10 years. We couldn't get those documents. We couldn't get any other documents. But then let's flip it. I've got Boyder's testimony. I've got the four releases, and I've got the American Chartered note showing that we paid this money. And then I have common sense. What do they have? What do they have? I just want to make sure I know. It feels as though this is a closing argument. This is an appellate argument. And so, what I was just asking is for you to articulate for me the evidence that we're relying on. So, as I understand it, we have the release. We have the money from American Chartered. And was there anything else? My client's testimony and the payoff letters. Because before this closing occurred, he wrote to, he contacted the bank and said, how much do I owe? And then on July 14th, they sent two payoff letters. And then after that, but then the one last quick point is, so we know what my evidence is, right? Mr. Gelman, I'm going to give you 10 more seconds. 10 seconds. What's their evidence that it wasn't paid? We have two vice presidents who signed these four deeds. They're not here saying they made a mistake. They don't have the bank records from July saying, well, we only got 600 or we didn't get anything. Where are those bank records? Shouldn't those be construed against them? I mean, part of the problem is they waited too long. I mean, the bank, so some of the evidence and the documents that I wish I could have gotten, like the title company or from American Chartered Bank, I couldn't get those at that point. Thank you, Mr. Gelman. Thank you. Thank you to counsel who took the case under advisement. Thank you very much.